IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 07 CR 565 |
| v. | ) | |
| | ) | Magistrate Judge Nan R. Nolan |
| ISAAC VASQUEZ | ) | |

## REPORT AND RECOMMENDATION

The Government seeks to revoke defendant Isaac Vasquez's supervised release. The motion was referred to this Court for an evidentiary hearing and a Report and Recommendation as to whether Vasquez's supervised release should be revoked. In making its recommendation on this matter, the Court has considered the facts and documents set forth in the record and the parties' briefs and submissions, as well as the evidence presented at a hearing on March 3, 2011. For the reasons set forth below, the Court recommends that the Government's motion for revocation of Defendant's supervised release be denied.

## I. BACKGROUND

### A. Conviction

On October 28, 1998, Vasquez pleaded guilty in the Circuit Court of Cook County, Illinois, to Predatory Criminal Sexual Assault, Victim Under the Age of 13, and was sentenced to six years imprisonment. (Doc. 49 at 1.) Upon his release, on December 19, 2003, he registered as a sex offender pursuant to Illinois law. (*Id.*)

After initially registering under the Illinois law, Vasquez changed residences within the city of Chicago but failed to report this change as required. (Doc. 49 at 1.) After being arrested and charged, he pleaded guilty to Failure to Report a Change of Address and was sentenced to one year of imprisonment. (*Id.*) After being released on parole on March 15, 2005, Vasquez disappeared and failed to register. (*Id.* 1-2.) Some time after April 11, 2007, he left Illinois and traveled to California, where he also failed to register as a sex offender. (*Id.* 2.) On or about July 3, 2007, Vasquez was taken into custody by the United States Marshals Service. (*Id.*)

Thereafter, Vasquez was indicted for knowingly failing to register as a sex offender in violation of the Sex Offender Registration and Notification Act ("SORNA"), 18 U.S.C. § 2250(a). (Doc. 49 at 2.) After the District Court denied his motion to dismiss the indictment, *United States v. Vasquez*, 576 F. Supp. 2d 928 (N.D. Ill. 2008), the case proceeded to a bench trial on stipulated facts. (Doc. 55 at 1.) On May 19, 2009, after denying Vasquez's motion for acquittal, the District Court convicted and sentenced him to a prison term of 27 months, a supervised release term of 3 years, and a special $100 assessment. (Doc. 75; Judgment.) On July 1, 2010, the Seventh Circuit Court of Appeals affirmed. *United States v. Vasquez*, 611 F.3d 325 (7th Cir. 2010), *petition for cert. filed*, No. 10-8526 (Jan. 14, 2011).

## B. Sex Offender Treatment Program

On January 4, 2010, Vasquez was released from prison and began his term of supervised release. The terms of Vasquez's supervised release include the requirement that he

participate in a mental health and/or sex offender treatment program as directed by the probation officer. The defendant shall comply with all recommended treatment which may include psychological and physiological testing.

(Judgment 6.) On January 19, 2010, Vasquez was referred to a probation office contract treatment program, Human Effective Living Program ("HELP"), for a sex offender evaluation. (United States Probation Office's Special Report ("Special Report") 4.)[1] Vasquez signed a release authorizing HELP to release confidential information to the United States Probation Office of the Northern District of Illinois ("USPO"). (Treatment Services Contract Program Plan ("Program Plan") 2.)[2] In late February 2010, Vasquez began the initial testing portion of the program. (Special Report 4.) He was specifically cautioned by HELP that certain information obtained from the evaluation may be revealed to law enforcement officials and informed that he could "choose not to answer any questions if to do so would reveal information which must be reported to the authorities." (Doc. 115 Ex. 1 ("HELP Consent Form") at 1.)

Vasquez completed the first two phases of his evaluation without incident. (Resp. 1.) The first phase required him to view images of males and females of various ages on a computer and report his sexual response to each image, and Vasquez completed that phase. (*Id.*; HELP Consent Form 1.) The next phase required him to answer a series of multiple-choice and true/false questions, which Vasquez completed to the best of his ability. (*Id.*)

---

[1] The Special Report was provided to the Court at the March 3, 2011 hearing.

[2] The Program Plan was provided to the Court at the March 3, 2011 hearing.

In early March, Vasquez was given a questionnaire that asked him a series of questions about his life and conduct before he was on supervised release, including criminal conduct. (Doc. 115 ¶ 5.) Vasquez was informed that he would undergo a polygraph examination that included similar questions. (*Id.*) Because he was concerned that these questions might cause him to make incriminating statements against himself, Vasquez requested and was allowed time to consult with counsel. (*Id.*)

Vasquez's counsel ("counsel"), who had represented him at his criminal trial and on appeal, sought assurances from United States Probation Officer Michael Pentangelo that Vasquez would not be questioned about potentially incriminating acts. (Doc. 105 ¶ 4.) In conversations with the USPO, "counsel learned that: (a) the evaluation does contain questions about prior acts and events completely unrelated to Vasquez's case, including potentially self-incriminating questions; (b) counsel would not be allowed to review the questions in advance; and (c) counsel would not be allowed to participate in the questioning." (Doc. 115 ¶ 6; *see* Doc. 105 ¶ 4.) Consequently, on March 8, 2010, counsel informed Pentangelo that although Vasquez was willing to participate in evaluation and treatment, he was invoking his Fifth Amendment right against self-incrimination and would not be participating in the scheduled polygraph examination. (Doc. 105 ¶ 5.) Pentangelo responded by stating that the supervised release requirement to "comply with all recommended treatment which may include psychological and physiological testing" necessarily means that Vasquez must comply with the polygraph examination. (*Id.* ¶ 6.) Consequently,

on March 9, 2010, Vasquez filed a Motion to Clarify Conditions of Supervised Release, arguing that his "obligation to participate in sex offender treatment does not include a requirement that he waive his right against self-incrimination and participate in the scheduled polygraph examination or otherwise answer questions about potentially incriminating conduct." (*Id.* 3.) Vasquez's evaluation was put on hold pending resolution of the motion. (Doc. 115 ¶ 9.)

In responding to Defendant's motion, the Government acknowledged that Vasquez retains his Fifth Amendment right against self-incrimination. (Doc. 108 ¶¶ 5, 7–8.) Nevertheless, the Government argued that Defendant's motion was moot or premature because he had not yet been asked any incriminating questions. (*Id.* ¶¶ 5, 8.) Specifically, the Government maintained that because the Fifth Amendment protection applies to specific questions, "Defendant cannot assert a prospective, blanket Fifth Amendment privilege as a basis to refuse to comply with the [polygraph examination] ordered by this Court." (*Id.* ¶¶ 5, 7–8.) Nevertheless, the Government reiterated that should Defendant submit to polygraph testing, he may properly "invoke the Fifth Amendment in response to a specific question posed." (*Id.* ¶ 8.)

On August 9, 2010, the District Judge denied the motion in a minute order, stating that Vasquez has the right to reject his counsel's advice not to participate in the polygraph examination:

> His conviction affirmed on appeal and now on supervised release, convicted sex offender Vasquez has "thus far participated in the evaluation process and he remains willing to participate in treatment should it be deemed necessary." Pro bono counsel asserts in his motion "that

counsel could not permit him to participate in the scheduled polygraph examination." Vasquez has the right to reject the advice of counsel and to comply with the Judgment of Conviction that was entered in this case. Counsel's motion is denied.

(Doc. 110.)

Subsequent to the District Court's order, the USPO scheduled Vasquez to continue the evaluation. (Doc. 115 ¶ 11.) Vasquez's request that his counsel be present during any questioning that might implicate his Fifth Amendment rights was denied by HELP and the USPO. (*Id.*) Further, the USPO refused counsel's request to postpone any testing until he returned from vacation on August 24, 2010. (*See* Letter from Thomas M. Stanton to Pentangelo (Aug. 13, 2010) ("Letter").)[3]

On August 16 and 27, 2010, Vasquez was provided with a series of pamphlets, each of which contained dozens of yes/no and true/false questions, and a 62-page questionnaire, which contained approximately 15–20 questions per page and sought written narrative responses to each question. (Doc. 115 ¶ 12.) It was Vasquez's understanding that the 62-page questionnaire would form the basis for the polygraph examination. (*Id.*; *see* HELP Sex Offender Evaluation Personal Survey ("Personal Survey") 1 ("You will be polygraphed on the basis of information given in this survey as well as other statements you make, or have made.").)[4] The Personal Survey includes questions asking Vasquez about past criminal conduct, both sexual and nonsexual. (*See*, *e.g.*, Personal Survey 36 ("Have you ever harmed your partner

---

[3] The Letter was provided to the Court at the March 3, 2011 hearing.

[4] On January 28, 2011, the District Judge granted Defendant's motion and directed the USPO to provide counsel with copies of the Personal Surveys which Vasquez had completed. (Docs. 120, 122.) The Personal Surveys were provided to the Court at the March 3, 2011 hearing.

physically?"), 42 ("How many children have you sexually abused?"), 54 ("Have you ever possessed child pornography?"), 55 ("Have you ever taken pictures of children engaging in sexual activity"?), 56 ("Have you ever touched a child's genitals?").)

At the August 16 session, Vasquez provided answers to most of the questions in the pamphlets, but left some sections blank because he could not decide if his answers would implicate his Fifth Amendment right against self-incrimination. (Doc. 115 ¶ 14.) At the August 27 evaluation, he was able to get through approximately 30% of the questions in the 62-page questionnaire. (*Id.* ¶ 16.) Of the questions he was able to get through, he left significant sections blank because he was unsure if his answers were protected by the Fifth Amendment. (*Id.*) The HELP evaluator denied Vasquez's request to show the questionnaire to counsel so that he did not inadvertently waive his Fifth Amendment rights. (*Id.*) Thus, Vasquez was forced to contact counsel before and after each session, requesting advice about whether his right against self-incrimination protected him from answering certain questions he had committed to memory or certain categories of questions he was being asked to answer. (*Id.* ¶ 15.)

On September 1, 2010, Defendant filed a Motion to Permit Defense Counsel to Participate in Questioning of Defendant During Evaluation for Sex Offender Treatment or Other Appropriate Relief. Vasquez argued that because the Fifth Amendment privilege involves complicated legal issues, he was "incapable of exercising his Fifth Amendment right against self-incrimination on his own on a question-by-question basis during the evaluation process." (Doc. 115 ¶ 20.) Conse-

quently, "Vasquez needs the assistance of counsel, or other similar relief, in order to effectively protect the constitutional right he admittedly possesses and seeks to assert." (*Id.* ¶ 21.) In his motion, Vasquez suggested a number of alternatives to protect his Fifth Amendment rights during the evaluation process:

> One way to protect Mr. Vasquez's Fifth Amendment right during his evaluation is to permit defense counsel to participate in any questioning. This could mean: (a) permitting defense counsel to review in advance any questions that Mr. Vasquez is going to be asked; (b) permitting defense counsel to sit in the room during any questioning of Mr. Vasquez; or (c) permitting defense counsel to sit outside of the evaluation room and be available to consult with Mr. Vasquez before he answers any question.

> Another way to protect Mr. Vasquez's Fifth Amendment right is to grant him immunity from any answers he provides during this evaluation process.

> A third way to protect Mr. Vasquez's Fifth Amendment right is to order the Probation Office to refrain from asking any questions during the evaluation process that might be self-incriminating, and submit all questions to the court in advance for an in camera review to ensure compliance.

(*Id.* ¶¶ 22–24.)

The motion was heard by the District Judge on September 3, 2010. The District Court repeatedly emphasized that Vasquez has the right to assert his Fifth Amendment privilege during the course of the sex offender evaluation process. (Hr'g Tr. 4–5, Sept. 3, 2010) ("The defendant always has the right to assert his Fifth Amendment Rights." "And I should add that if he chooses to appropriately assert the Fifth Amendment in response to certain questions, he has the right to do so." "He does have the right to assert the Fifth Amendment during the course of the procedure." "There is no question that Mr. Vasquez does have the right to assert the

Fifth Amendment along the way.").[5] Nevertheless, the District Court found that Vasquez does not have a Sixth Amendment right to have counsel present during the evaluation. (*Id.* 3–5.) Consequently, the District Court denied the motion. (Doc. 117.)

Vasquez resumed the evaluation process at HELP. (Special Report 4.) On September 28, 2010, HELP advised Pentangelo that Vasquez was uncooperative and resistant to treatment. (*Id.*) "This was deduced by the fact that [Vasquez] blanketed an entire psycho/sexual clinical survey instrument invoking the 5th Amendment." (*Id.*) Pentangelo reviewed the survey and "determined that [Vasquez] was indeed demonstrating resistance as most of the questions had no basis for self incrimination." (*Id.*) Pentangelo discussed this issue with Vasquez, including "the context of self incrimination as it relates to a new criminal offense." (*Id.*) Pentangelo warned Vasquez "that this would be the final discussion on this particular matter and if any further resistance was observed, violation proceedings would be imminent." (*Id.*)

## C. Revocation of Supervised Release

On October 25, 2010, HELP discharged Vasquez from the sex offender evaluation process. (HELP USPO Closing Report ("Closing Report").)[6] HELP concluded that Vasquez was "extremely resistive, angry and dishonest" because he "refused to answer questions on survey (took the 5th amendment)." (*Id.*) On November 15, 2010, the USPO issued a Special Report seeking revocation of Vasquez's supervised

---

[5] The hearing transcript is attached as Ex. 1 to Defendant's Sur-Reply to Government's Motion for Revocation of Supervised Release. (*See* Docs. 139, 140.)

[6] The Closing Report was provided to the Court at the March 3, 2011 hearing.

release because of his alleged violation of his conditions of supervision for failing to comply with the sex offender treatment program. (Special Report 3, 5.)

On February 28, 2011, the Government filed a Motion for Revocation of Supervised Release ("Motion"). In its Motion, the Government concurs with the recommendations of the USPO and requests that the Court revoke Defendant's supervised release and order him to serve 24 months of imprisonment. (Mot. 3.) The Government argues that Vasquez's persistent refusal to answer questions pursuant to the Fifth Amendment has not been in "good faith." (*Id.* ¶ 4.) The Government contends that because Vasquez has "failed to meaningfully participate in the sex offender treatment program," "he continues to be a danger to the community." (*Id.* ¶¶ 3, 6.) Defendant filed a Response on March 2, 2011. On March 18, 2011, the Government filed a Reply, and on March 25, 2011, Defendant filed a Sur-Reply.

## II. DISCUSSION

### A. Applicable Law

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment not only allows an individual to refuse to testify against himself at a criminal trial, but also permits him to decline to answer official questions put to him "in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973); *see Minnesota v. Murphy*, 465 U.S. 420, 426 (1984); *United States v. Swanson*, — F.3d —, 2011 WL 1045843, at *5 (7th Cir. Mar. 24, 2011). A

person does not lose this privilege due to a criminal conviction, even if he is imprisoned or on probation when the questions are put to him, *Murphy*, 465 U.S. at 426, and the privilege is available even to those who claim innocence, *Ohio v. Reiner*, 532 U.S. 17, 21 (2001); *see Grunewald v. United States*, 353 U.S. 391, 421 (1957).

Nevertheless, nothing in the Fifth Amendment prevents a witness from testifying voluntarily on matters which could incriminate him, *Garner v. United States*, 424 U.S. 648,654 (1976); *Swanson*, — F.3d —, 2011 WL 1045843, at *5, and the privilege does not mitigate any general obligation to appear and answer questions truthfully, *Murphy*, 465 U.S. at 427. Rather, the privilege permits a witness to remain silent when he has "reasonable cause to apprehend danger [of self-incrimination] from a direct answer" to a specific question. *Hoffman v. United States*, 341 U.S. 479, 486 (1951); *see Reiner*, 532 U.S. at 21; *Mason v. United States*, 244 U.S. 362, 365 (1917). The privilege extends not only to answers that would directly support a criminal conviction, but "likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant" for a crime. *Hoffman*, 341 U.S. at 486; *see Reiner*, 532 U.S. at 20–21; *Kastigar v. United States*, 406 U.S. 441, 444–45 (1972) (stating that the Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used").

A witness who invokes the Fifth Amendment is not absolved from answering simply because he claims that his response would be incriminating; it is for the presiding court to say whether his silence is justified. *Hoffman,* 341 U.S. at 486; *see*

*Reiner,* 532 U.S. at 21; *Rogers* v. *United States,* 340 U.S. 367, 374 (1951). To maintain the privilege, it "need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer . . . or an explanation of why it cannot be answered might be dangerous." *Hoffman,* 341 U.S. at 486–87. Nevertheless, the danger must be "real and appreciable," *Hiibel* v. *Sixth Judicial District Court of Nevada,* 542 U.S. 177, 190 (2004) (citation omitted) and concerns of "imaginary and unsubstantial character" will not be sufficient. *Mason,* 244 U.S. at 366; *see Reiner,* 532 U.S. at 21; *Minor v. United States*, 396 U.S. 87, 97–98 (1969) (holding the Fifth Amendment inapplicable because the situation presented "only imaginary and insubstantial hazards of incrimination"); *Hiibel*, 542 U.S. at 190–91 (ruling that imaginary or speculative dangers are insufficient to justify the privilege).

A court should focus its determination on what a truthful answer might disclose rather than on what information is sought by the questioner. *Zicarelli* v. *N.J. State Comm'n of Investigation,* 406 U.S. 472, 480 (1972). The presiding judge should be governed both by the facts in evidence as well as his personal perception of the circumstances of the case when assessing the privilege claim. *Hoffman,* 341 U.S. at 487. The witness will be required to answer only if "it clearly appears to the court that he is mistaken" as to the self-incriminating nature of the answer. *Id.* at 486.

## B. Analysis

In its Motion, the Government requests that the Court revoke Defendant's supervised release and sentence him to 24 months of imprisonment.[7] (Mot. 3.) The Government contends that Vasquez has "failed to meaningfully participate in the sex offender treatment program" as required during his supervised release. (*Id.* ¶¶ 1, 3.) Specifically, the Government asserts that Vasquez "refused to submit to an introductory questionnaire that is necessary for the treatment provider to properly assess the defendant so that it may ultimately prescribe a treatment program." (*Id.* ¶ 3.) The Government argues that Vasquez's refusal to answer certain questions pursuant to his Fifth Amendment right against self incrimination was not done in good faith because the questions "could not possibly be viewed as calling for an incriminating answer." (*Id.* ¶ 4.)

In February 2010, Vasquez began the initial testing portion of the sex offender treatment program. (Special Report 4.) The first two phases, which Vasquez completed without incident, required him to view images of males and females of various ages on a computer and report his sexual response to each image, and to answer a series of multiple-choice and true/false questions. (Resp. 1; Doc 115 Ex. 1 at 1.)

In early March 2010, Vasquez was given a questionnaire, which included a series of questions about his life and conduct before he was on supervised release, including criminal conduct, and was informed that he would undergo a polygraph ex-

---

[7] The parties did not address the sentencing issue. Because the Court recommends that the Government's Motion be denied, it expresses no opinion on what term of imprisonment, if any, would be appropriate if the Court did revoke Defendant's term of supervised release.

amination that included similar questions. (Doc. 115 ¶ 5.) In conversations with the USPO, Vasquez's counsel "learned that: (a) the evaluation does contain questions about prior acts and events completely unrelated to Vasquez's case, including potentially self-incriminating questions; (b) counsel would not be allowed to review the questions in advance; and (c) counsel would not be allowed to participate in the questioning." (Doc. 115 ¶ 6; *see* Doc. 105 ¶ 4.) Consequently, counsel informed Pentangelo that although Vasquez was willing to participate in evaluation and treatment, he was invoking his Fifth Amendment right against self-incrimination and would not be participating in the scheduled polygraph examination. Counsel also filed a motion seeking clarification of the conditions of Vasquez's supervised release, arguing that Vasquez was not required to participate in a polygraph examination that may seek incriminating information. (Doc. 105.) In responding to Defendant's motion, the Government acknowledged that Vasquez retains his Fifth Amendment right against self-incrimination, but maintained that he may only "invoke the Fifth Amendment in response to a specific question posed." (Doc. 108 ¶¶ 5, 7–8.)

After the District Judge denied the motion in August 2010, the USPO scheduled Vasquez to continue the sex offender evaluation process. (Doc. 115 ¶ 11.) On August 16 and 27, 2010, Vasquez was provided with a series of pamphlets, each of which contained dozens of yes/no and true/false questions, and a 62-page questionnaire, which contained approximately 15–20 questions per page and sought written narrative responses to each question. (*Id.* ¶ 12.) At the August 16 session, Vasquez provided answers to most of the questions in the pamphlets, but left some sections

blank because he could not decide if his answers would implicate his Fifth Amendment right against self-incrimination. (*Id.* ¶ 14.) At the August 27 evaluation, he was able to get through approximately 30% of the questions in the 62-page questionnaire. (*Id.* ¶ 16.) Of the questions he was able to get through, he left significant sections blank because he was unsure if his answers were protected by the Fifth Amendment. (*Id.*)

On September 1, 2010, Defendant filed a Motion to Permit Defense Counsel to Participate in Questioning of Defendant During Evaluation for Sex Offender Treatment or Other Appropriate Relief, arguing that because the Fifth Amendment privilege involves complicated legal issues, he was "incapable of exercising his Fifth Amendment right against self-incrimination on his own on a question-by-question basis during the evaluation process." (Doc. 115 ¶ 20.) The motion was heard by the District Judge on September 3, 2010. The District Court ruled that while Vasquez has the right to assert his Fifth Amendment privilege during the course of the sex offender evaluation process, he does not have a Sixth Amendment right to have counsel present during the evaluation. (Hr'g Tr. 3–5.)

Thereafter, Pentangelo advised Vasquez that his widespread use of the Fifth Amendment to refuse to answer certain questions, which Pentangelo asserted were not incriminatory, demonstrated that Vasquez was uncooperative and resistant to treatment. (Special Report 4.) Pentangelo warned Vasquez "that this would be the final discussion on this particular matter and if any further resistance was observed, violation proceedings would be imminent." (*Id.*) On October 25, 2010, HELP

discharged Vasquez from the sex offender evaluation process because he "refused to answer questions on survey (took the 5th amendment)." (Closing Report.) On November 15, 2010, the USPO issued a Special Report seeking revocation of Vasquez's supervised release because of his alleged violation of his conditions of supervision for failing to comply with the sex offender treatment program. (Special Report 3, 5.)

The parties agree that Vasquez retains his Fifth Amendment privilege against self-incrimination while on supervised release and may assert it in response to questions asked during the sex offender treatment program. (Doc. 108 ¶¶ 5, 7–8; Resp. 1–4; Reply 4; *see also* Hr'g Tr. 4 (ruling by District Judge that "if [Defendant] chooses to appropriately assert the Fifth Amendment in response to certain questions, he has the right to do so")); *Murphy*, 465 U.S. at 426 (When "questions put to [a] probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution," he may properly invoke his right to remain silent.). Nevertheless, the Government asserts that Defendant did not exercise his Fifth Amendment right "in good faith" because he "pled the Fifth Amendment to questions that could not possibly be viewed as calling for an incriminatory answer." (Mot. ¶ 4.) The Court disagrees.

The Government and the USPO should not be surprised that Vasquez was acutely wary about making self-incriminating statements. Even before he began the sex offender treatment program, he was asked to sign a release authorizing HELP to release confidential information to the USPO. (Program Plan 2.) After he began the program, HELP warned Vasquez that certain information obtained from the

evaluation may be revealed to law enforcement officials. (HELP Consent Form 1); *see United States v. Antelope*, 395 F.3d 1128, 1135 (9th Cir. 2005) ("We have no doubt that any admissions of past crimes would likely make their way into the hands of prosecutors.")

Nor should the Government or the USPO be surprised that Vasquez exercised his Fifth Amendment right and refused to answer certain questions. HELP specifically encouraged Vasquez "not to answer any questions if to do so would reveal information which must be reported to the authorities." (HELP Consent Form 1.) The Government itself acknowledged that Vasquez may properly invoke the Fifth Amendment in response to incriminating questions. (Doc. 108 ¶¶ 5, 7–8.) Further, the District Court specifically ruled that Vasquez has the right "to appropriately assert the Fifth Amendment in response to certain questions." (Hr'g Tr. 4.)

The USPO has no authority to decide whether Vasquez properly invoked his Fifth Amendment right. Instead, "it is for the court to say whether his silence is justified and to require him to answer if it clearly appears to the court that he is mistaken." *Hoffman*, 341 U.S. at 486 (citations omitted); *see* Robert S. Hunter, *Federal Trial Handbook Criminal* § 44:9 (4th ed. 2010) ("It is the province of the court to determine in the first instance under all the circumstances of the case whether any direct answer to a proposed question has a tendency to incriminate a witness."). Here, the parole officer drew his own legal conclusions and offered legal advice to Vasquez on the self-incrimination issue. In September 2010, Pentangelo reviewed Vasquez's survey responses and "determined that . . . most of the questions had no

basis for self incrimination." (Special Report 4.) Thereafter, Pentangelo discussed the issue with Vasquez, providing his own legal advice regarding "the context of self incrimination as it relates to a new criminal offense." (*Id.*) Pentangelo also warned Vasquez "that this would be the final discussion on this particular matter" and threatened him with violation proceedings if he continued to insist on invoking his Fifth Amendment rights. (*Id.*)

The Court is troubled that Pentangelo, someone who does not represent Vasquez, and who is apparently not a lawyer, would even attempt to advise Vasquez on the intricacies of criminal and constitutional law. The Government contends that "one does not need a law license to recognize that answering whether one has a best friend or gets along with his or her siblings does not call for a self incriminating answer." (Reply 4.) However, the Fifth Amendment privilege is not reviewed in a vacuum. As discussed more fully below, a court must analyze the Fifth Amendment issue in light of the surrounding circumstances and what a truthful answer may disclose rather on the information sought. *See Zicarelli*, 406 U.S. at 480; *Hoffman*, 341 U.S. at 487. In any event, Pentangelo was fully aware that "Vasquez had counsel ready, willing, and able to advise Vasquez of his Fifth Amendment rights and assist him in answering questions on the Personal Survey, but he did not once reach out to defense counsel for such assistance or encourage Vasquez to contact his attorney." (Resp. 8.) Instead, despite Fifth Amendment protections, Pentangelo threatened Defendant with revocation of his supervised release unless he answered the questions. *See Pentlarge v. Murphy*, 541 F. Supp. 2d 421,

427 (D. Mass. 2008) ("A program that provides treatment *if and only if* committed individuals relinquish their Fifth Amendment rights is similarly unconstitutional in that it imposes a cost—the loss of constitutionally guaranteed treatment—on the assertion of the right against self-incrimination.").

The Personal Survey is replete with questions that clearly seek incriminating answers and others that may lead to incriminatory evidence. (*See*, *e.g.*, Personal Survey 6 ("When did the deviant behavior(s) begin?"), 19 ("How do you behave when you are angry with a child?"), 20 ("Describe your first sexual experience."), 27 ("List the three most stressful events you can remember from your past."), 33 ("Do you find yourself looking for children to have sexual contact with?"), 34 ("I threaten my partner with a weapon."), 36 ("Have you ever harmed your partner physically?"), 42 ("How many children have you sexually abused?"), 50 ("Have you downloaded pornography involving teens or children?"), 52 ("Have you ever communicated with someone whom you thought was a minor in a chat room?"), 54 ("Have you ever possessed child pornography?"), 55 ("Have you ever taken pictures of children engaging in sexual activity"?), 56 ("Have you ever touched a child's genitals?"), 58 ("Have you ever destroyed any child pornography?").) Nevertheless, the Government argues that Vasquez "pled the Fifth Amendment to questions that could not possibly be viewed as calling for an incriminating answer." (Mot. ¶ 4.) In its motion, however, the Government identifies only two such questions—"Were you ever bullied or severely teased?" and "Please describe any accidents or injuries you have suffered?" (*Id.*)

The Fifth Amendment privilege extends not only to answers that would directly support a criminal conviction, but "likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant" for a crime. *Hoffman*, 341 U.S. at 486; *see Kastigar*, 406 U.S. at 444–45 (stating that the Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used"). Thus, to maintain the privilege, it "need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer . . . or an explanation of why it cannot be answered might be dangerous." *Hoffman,* 341 U.S. at 486–87. Accordingly, a court must focus its determination on what a truthful answer might disclose rather than on what information is sought by the questioner. *Zicarelli,* 406 U.S. at 480. The presiding judge should be governed both by the facts in evidence as well as his personal perception of the circumstances of the case when assessing the privilege claim. *Hoffman,* 341 U.S. at 487.

Here, the Court is mindful that the Personal Survey is directly related to Vasquez's sex offender evaluation and treatment program. An essential part of such programs requires participants to confront and take responsibility for past criminal conduct. *See McKune v. Lile*, 536 U.S. 24, 33 (2002) (plurality opinion) ("An important component of [sex offender] rehabilitation programs requires participants to confront their past and accept responsibility for their misconduct. . . . Research indicates that offenders who deny all allegations of sexual abuse are three times more

likely to fail in treatment than those who admit even partial complicity."). The Court "do[es] not doubt that [HELP's] policy of requiring convicted sex offenders to give a sexual history, admitting responsibility for past misconduct to participating counselors, serves an important rehabilitative purpose." *Antelope*, 395 F.3d at 1137. The constitutional problem, however, is that despite the rehabilitative purpose, the Personal Survey seeks information that is or may be incriminating, and which the Government may use to prosecute Vasquez. *See id.* at 1138 ("The irreconcilable constitutional problem, however, is that even though the disclosures sought here may serve a valid rehabilitative purpose, they also may be starkly incriminating, and there is no disputing that the government may seek to use such disclosures for prosecutorial purposes."). Under these circumstances, even answers to seemingly "innocent" questions could reveal information that may lead to incriminating evidence. *See* Wayne R. LeFave, *et al.*, *Criminal Procedure* § 8.10(a) (3d ed. 2010) ("Indeed, the potential lead to incriminatory evidence may come not from the answer to the question asked, but from what would be revealed by the witness answering this question and then asserting the privilege as to another question that the prosecution will ask in the course of the same examination."). Such hazards are neither imaginary nor insubstantial. *Cf. Minor*, 396 U.S. at 97–98 (holding the Fifth Amendment inapplicable because the situation presented "only imaginary and insubstantial hazards of incrimination"); *Hiibel*, 542 U.S. at 190–91 (ruling that imaginary or speculative dangers are insufficient to justify the privilege). Accordingly, the Court cannot conclude that Defendant was clearly mistaken when he in-

voked his Fifth Amendment rights. *See Hoffman*, 341 U.S. at 486 (The witness will be required to answer only if "it clearly appears to the court that he is mistaken" as to self incriminating nature of the answer.); *In re Folding Carton* Antitrust *Litig.*, 609 F.2d 867, 871 (7th Cir. 1979) ("When a witness can demonstrate any possibility of prosecution which is more than fanciful he has demonstrated a reasonable fear of prosecution sufficient to meet constitutional muster."); *see also Mason v. United States*, 244 U.S. 362, 366 (1917) (ruling the issue largely discretionary with the court or the judge); *accord United States v. Washington*, 318 F.3d 845, 856 (8th Cir. 2003).

Nevertheless, the Government contends that the issue is Defendant's uncooperativeness, not whether he has a Fifth Amendment right to refuse to answer certain questions. (Mot. ¶¶ 5–6; Reply 2–5.) In support, the Government identifies a dozen questions on which Vasquez invoked his Fifth Amendment rights during his first attempt to complete the Personal Survey, many of which he then answered on his second attempt. (Reply 2–3.) The Government argues that "defendant providing answers to these questions demonstrates that, each time he took the survey, he was aware that the questions did not truly call for incriminating answers and his refusal to fill out the survey was a product of his non-cooperation, as opposed to his fear of self incrimination.") (*Id.* 3.) On the contrary, the Court finds that answering many more questions on his second attempt demonstrates that Defendant was being cooperative, not uncooperative. In between his two attempts, Vasquez had an opportunity to consult with counsel and better determine if certain questions implicated his

Fifth Amendment rights. (*See* Doc. 115 ¶ 15.) (Vasquez was forced to contact counsel before and after each session, requesting advice about whether his right against self-incrimination protected him from answering certain questions he had committed to memory or certain categories of questions he was being asked to answer.) In fact, now that counsel has a copy of the Personal Survey, which he can review with Defendant, it is likely that if given another opportunity to complete the Personal Survey, Vasquez would answer even more questions.

The Government also contends that "had the defendant been truly cooperative, he would have filled out the survey in its entirety each time it was presented to him." (Reply 3.) On the contrary, Vasquez was told to take his time completing the 62-page survey and if unable to complete it one sitting to make another appointment to continue it. (Sur-Reply 2–3.) On his first attempt, he completed 24 pages and then made an appointment to continue. (*Id.* 3; Doc. 115 ¶ 16.) However, before he could return, he was summoned to the USPO and informed by Pentangelo that most of the questions on which he had asserted a Fifth Amendment privilege "had no basis for self incrimination." (Special Report 7; *see* Sur-Reply 3.) When Vasquez attended his next appointment at HELP, instead of continuing his previous survey, he was told to begin the process again. (Sur-Reply 3.) He was able to complete approximately 12 pages and then scheduled another time to continue it. (*Id.*) Again, however, before he could return to HELP, he was summoned to another meeting with Pentangelo and subsequently discharged from the sex offender evaluation program. (*Id.*; Special Report 4–5.)

Further, there is other significant evidence of Defendant's cooperativeness. He participated in at least six HELP sessions, constituting more than 12 hours of time. (Resp. 1.) He completed the first two phases of the sex offender evaluation program, which included reporting his sexual response to images of males and females of various ages and answering a series of multiple-choice and true/false questions, without incident. (*Id.*) He provided answers to most questions in a series of pamphlets. (Doc. 115 ¶¶ 12, 14.) He did not refuse to complete the Personal Survey; instead, he completed as much as he could in the time allotted while being mindful of HELP's warning that certain information may be revealed to law enforcement officials and that he could "choose not to answer any questions if to do so would reveal information which must be reported to the authorities." (HELP Consent Form 1.) Further, Defendant refused to answer certain questions only after his repeated requests to consult with attorney were thwarted, including a request to postpone questioning while counsel was on vacation. (Doc. 115 ¶¶ 5–6, 11, 15; Letter.)

Moreover, Vasquez's cooperativeness was manifested through his attempt to find a workable solution between two competing requirements—HELP's need for detailed, specific information to make an informed sex offender evaluation and Vasquez's constitutional right to avoid incriminating himself, which all parties and the District Judge agree he retains. For example, Vasquez suggested a number of alternatives to protect his Fifth Amendment rights during the evaluation process: (a) permitting counsel to review in advance any questions that Vasquez is going to be asked; (b) permitting counsel to sit in the room during any questioning of

Vasquez; (c) permitting counsel to sit outside of the evaluation room and be available to consult with Vasquez before he answers any question; (d) granting Vasquez immunity from any answers he provides during this evaluation process; and (e) refraining from asking Vasquez any questions during the evaluation process that might be self-incriminating. (*See* Doc. 115 ¶¶ 22–24.) All have been rejected by the USPO or the Government.

In any event, the Government's assertion that Vasquez has failed to cooperate in the sex offender evaluation program is derived solely from Defendant invoking his Fifth Amendment privilege in response to certain questions in the Personal Survey. HELP discharged Vasquez from the sex offender evaluation program because he "took the 5th amendment" in response to questions on the Personal Survey. (Closing Report.) The USPO issued a Special Report seeking to revoke Vasquez's supervised release, stating that "[Vasquez] remains resistant to treatment and is not cooperating. This was deduced by the fact that [Defendant] blanketed an entire psycho-sexual clinical survey instrument invoking the 5th Amendment." (Special Report 4.) And, the Motion states that by "refus[ing] to answer almost a third of the questions presented to him and ple[ading] the Fifth Amendment to questions that could not possibly be viewed as calling for an incriminating answer," Vasquez has "failed to meaningfully participate in the sex offender treatment program." (Mot. ¶¶ 3, 4.)

Therefore, as discussed above, given the circumstances under which the Personal Survey was given—as part of a sex offender evaluation and treatment program which generally requires participants to confront and take responsibility for

past criminal conduct—the Court cannot find that the Personal Survey questions present only imaginary and insubstantial hazards of incrimination. Accordingly, the Court cannot conclude that Defendant has failed to meaningfully participate in the sex offender treatment program. The Government's Motion should be denied.[8]

Going forward, given the Government's refusal to allow Vasquez contemporaneous access to counsel while he is completing the Personal Survey (or Polygraph Examination), the Government has several options. One, the USPO can place Vasquez in a sex offender treatment program that does not require him to reveal self-incriminating information. Two, the USPO can "accept" that Vasquez will invoke his Fifth Amendment privilege as to certain questions without considering him uncooperative. Third, should the Government desire Vasquez to answer all the questions, it can grant Vasquez immunity from any answers he provides during this evaluation process. *See United States v. Stoterau*, 524 F.3d 988, 1004 (9th Cir. 2008) ("Should the government desire Stoterau to answer [questions asked during his sex offender treatment program], it may afford his answers the protection of use and derivative use immunity."); *accord Antelope*, 395 F.3d at 1141 & n.5.

The District Court may find that immunity is appropriate under these circumstances. As counsel acknowledged, Defendant "is willing to participate in the sex

---

[8] Even if the Court found that Defendant invoked his Fifth Amendment privilege in error, the likely remedy would be to order Defendant to answer the questions, not revoke his supervised release. *See generally*, *United States v. Chandler*, 380 F.2d 993, 1000 (2d Cir. 1967) ("Upon invocation of the privilege and the court's determination that a witness should answer, the court should (1) warn the witness of the possibility of contempt, (2) in the clearest terms direct the witness (not merely through a statement to his attorney) to answer, and (3) see that the record clearly reflects that the witness persists in his refusal to respond.").

offender treatment evaluation process—and treatment itself if deemed necessary—but he is not willing to give up his Fifth Amendment rights in order to do so." (Sur-Reply 8.) Given that sexual offender treatment programs are effective when the participant is free to accept responsibility for past misconduct, *see McKune*, 536 U.S. at 33; *Antelope*, 395 F.3d at 1137, the Government can encourage rehabilitation by freeing Defendant from the hazards of self-incrimination.

## III. CONCLUSION

For the reasons stated above, the Government's Motion for Revocation of Supervised Release [130] should be denied.

Counsel has 14 days from the date of service of this Court's Report and Recommendation to file objections with the Honorable Charles R. Norgle. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

E N T E R:

Dated: April 25, 2011

Nan R. Nolan
_____
NAN R. NOLAN
United States Magistrate Judge